E-FILED
Monday, 29 July, 2019  11:58:54 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CIARA VESEY, | CASE NO: 4:18-cv-04124-SLD-JEH |
| PLAINTIFF, | |
| vs. | |
| ENVOY AIR, INC. d/b/a AMERICAN EAGLE AIRLINES, INC., | |
| DEFENDANT. | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff and submits the following in response to Defendant's motion for summary judgment.

## I.   INTRODUCTION

Plaintiff is an African American woman who worked as a ticket agent for Defendant in its Moline location. Very few minorities worked in this office where the general manager, Teresa White, was running the small outfit as she saw fit, which fit herself and a host of employees who were hired in as friends along with certain of her managers.

Plaintiff was not liked because she attempted to obtain equal treatment for her and her fellow employees that were not treated fairly and/or equally.  Plaintiff worked for Envoy for four years and prior to her last year there, only had one incident several years prior in which she mistakenly hit an aircraft with a jet bridge.

After Plaintiff reported a sexual affair between a manager, Carrie McMurray and an employee, Eric Masengarb, and a racial remark also made by Mr. Masengarb, did all of her

1

problems begin, including harassment, a toxic workplace environment, and being passed over for jobs for which she applied.  The evidence will further show that there were few, if any, checks and balances in place and if Defendant's management wanted someone out, they would find a way to show a person the door.  Defendant's General Manager, Ms. White, was a close acquaintance with one of Defendant's lead agents, Ms. McMurray, and that Ms. White defended Mr. Masengarb, who was terminated for racial remarks – the same being a terminable offense which was a component of the racial hostilities at work and the deep toxic work environment. All three – White, McMurray and Masengarb – conspired to make-up a phony, pretextual reason to get Plaintiff terminated.  The little, if ever used, travel abuse policy that Defendant allegedly used to fire Plaintiff only furthered this conspiracy. The travel abuse policy was not only unknown and unfamiliar to any of the employees who sat for a deposition this matter, there is no evidence that anyone had ever been fired for violating this policy.  Many employees hired-in merely for the convenience of travel privileges, and Defendant suffered no damages as a result of Plaintiff's alleged actions.  Plaintiff was given no attempt to cure nor ever received a warning or had any corrective action taken.

## II.    RESPONSES TO DEFENDANT'S FACTS

### a.  Undisputed Material Facts

1. Plaintiff began working for Envoy as a Station Agent at Quad Cities International Airport ("MLI") in July of 2012.[1]

   RESPONSE: Undisputed, material fact.

2. Teresa White was the General Manager during Ciara Vesey's employment; Carrie McMurray was a Lead Station Agent.[2]

---

[1] See Exhibit 1: Deposition of Ciara Vesey ("Vesey Dep") at 8.

RESPONSE: Undisputed, material fact.

5.  On August 30, 2012, Plaintiff initialed and signed an Enter-On-Duty Orientation Sign Off Sheet, in which she agreed to "review all rules and information related to [her] Travel Privileges and abide by such rules."[3]

RESPONSE: Undisputed, material fact.

6.  During Plaintiff's employment, she reviewed Envoy's intranet to look at policies related to travel benefits and she reviewed the Trip Book.[4]

RESPONSE: Undisputed, material fact.

7.  The Travel Guide (formerly known as the Trip Book) is a comprehensive set of policies and procedures that apply to all Envoy employees with respect to their use of employee travel benefits.[5]

RESPONSE: Undisputed, material fact.

10. Sabre is the computer system Envoy employees use to manage passenger flight reservations.[6]

RESPONSE: Undisputed, material fact.

20. Envoy has a Work Environment Policy that prohibits discrimination in the workplace based on age, race, sex, color, religion, national origin, sexual orientation, disability or veteran status.[7]

RESPONSE: Undisputed, material fact.

---

[2] *Id.* at 74, 76
[3] *Id.* at 25–27, 44; Defendant's Exhibit 3: Enter On-Duty Orientation Sign Off Sheet
[4] See Exhibit 1: Vesey Dep., at 24-25.
[5] See Defendant's Exhibit 2: Durant Decl. at ¶¶ 7-8, Defendant's Exhibit A: Travel Guide; Exhibit 1: Vesey Dep. at 56-60.
[6] See Exhibit 1: Vesey Dep., at 57.
[7] See Exhibit 2: Deposition of Danielle Griffin ("Griffin Dep."), at 74–75; Defendant's Exhibit 7: Work Environment Policy.

21. The Work Environment Policy also "strictly prohibits harassment based on race, sex, religion, color, national origin, ancestry, mental or physical disability, medical condition, union or non-union affiliation, marital status, age, sexual orientation, or any other basis protected by federal, state or local law or ordinance."[8]

RESPONSE: Undisputed, material fact.

23. Envoy prohibits retaliation against employees who make complaints.[9]

RESPONSE: Admit that Envoy does have a policy that prohibits retaliation.

26. On August 17, 2016, Plaintiff complained to human resources that a co-worker, Eric Masengarb, told her to "go back and pick cotton."[10]

RESPONSE: Undisputed, material fact.

28. Plaintiff claims the following occurred:

Q. Correct. And tell me what happened that day in August that we are both referring to.
A. I believe it was August 15, 2016. We were in the break room, myself, Michael Watkins, Josh Stinocher, and Eric, and it was downtime, so we didn't have a flight operating at that period of time. And I don't remember the topic we were talking about, but it was either a song lyric or something either one of us were looking at on our phone. And Josh had asked me, he is, like, Ciara, I know you know about that purple drink. And then he said it kind of jokingly, and I just laughed back and said, Not every black person knows about purple drink. And we were just joking. And then, Eric, he wasn't part of the conversation, we weren't even talking to him. He chimes in and says, don't go playing that race card. And I said, Excuse me? Like, because the conversation shifted.· So I was, like, Excuse me?· He said, You heard what I said.· Don't go playing that race card. And I said, Well, you know, sarcastically, I said, I didn't realize I had played a race card. You know, I didn't know it was in my deck and didn't know I had played it yet today. And he said, you know what, why don't you just go back and pick cotton, is what he told me.[11]

RESPONSE: Undisputed, material fact.

---

[8] See Defendant's Exhibit 7: Work Environment Policy.
[9] Id.
[10] See Exhibit 1: Vesey Dep., at 108–111.
[11] Id. at 108–109.

33. Masengarb's employment was terminated.[12]

RESPONSE: Undisputed, material fact.

54. Plaintiff wrote and signed two statements following her interview with Durant and Stevens.[13]

RESPONSE: Undisputed, material fact.

55. In her statements, Plaintiff wrote "I had no prior knowledge that I was not able to cancel my itinerary at any time since I had paid for my ticket."[14]

RESPONSE: Undisputed, material fact.

58. Durant presented the findings of her investigation to Stevens.[15]

RESPONSE: Undisputed, material fact.

65. Plaintiff was terminated October 27, 2016.[16]

RESPONSE: Undisputed, material fact.

72. Plaintiff now claims that McMurray also harassed Plaintiff by telling other employees that she did not want to work with Plaintiff and she wanted Plaintiff fired.[17]

RESPONSE: This is not a new claim that is *now* being alleged. As cited by Defendant, this was stated in the complaint.

### b. Disputed Material Facts

4. Employees also had an employee discount code to use when she purchased a ticket (flying "revenue"), called "AA20." [18]

RESPONSE: This is a mischaracterization of Plaintiff's testimony.

8. Plaintiff had an understanding of how she was supposed to use her travel benefits at Envoy.[19]

---

[12] *Id.* at 114.
[13] *Id.* at 178–179; Exhibit 12: Written Statements dated 10/11/16 ("Written Statements").
[14] See Exhibit 12: Written Statements
[15] See Exhibit 3: Deposition of Irma Stevens, ("Steven's Dep.") at 45, 46–47; Exhibit 2: Durant Decl., at ¶ 24; Defendant's Exhibit B: Durant to Stevens Email Thread dated 10/20/16 ("Durant-Stevens Email Thread").
[16] See Dkt. 1: Complaint, at ¶ 30.
[17] See Exhibit 1: Vesey Dep., at 183–184, 190–191; Dkt. 1, Complaint, at ¶ 16.
[18] See Exhibit 1: Vesey Dep. at 60.

RESPONSE: This is a mischaracterization of Plaintiff's testimony.[20]

9. Under Envoy's Rules and Regulations, which Plaintiff signed, "[a]buse of travel privileges will be grounds for dismissal."[21]

RESPONSE: Under Envoy's Rules and Regulations, violations of company policy *may be* grounds for termination depending on the severity of the offense.[22]

14. The Travel Guide states:

> Non-revenue travelers are offered several company-approved flight check-in options. No other check-in options or applications may be used to check in for a flight or to be placed on the standby list. You may not use Sabre (or programs similar to Sabre) at work or at home to check in yourself or place yourself or guest travelers on the priority list.
> …
> Employees are not permitted to price (PQ), issue or reissue revenue or discounted tickets for themselves, friends, family or acquaintances…. This includes full fare tickets, AA20, ID/ZED or AAdvantage award tickets. Employees must seek the assistance of another agent/supervisor to price/issue or change an itinerary for themselves and/or friends, family or acquaintances.[23]

RESPONSE: Plaintiff disputes the Travel Guides application and interpretation. For instance, Plaintiff purchased her tickets, and was not a non-revenue passenger.

15. During her employment, Plaintiff was "generally" aware of the policy prohibiting Envoy employees with revenue tickets to price, issue, or change their own itineraries.[24]

RESPONSE: This is a mischaracterization of Plaintiff's testimony.

22. Employees who have observed or experienced harassment or discrimination in the workplace have multiple avenues to report such conduct, including any manager in their reporting line, human resources, or an anonymous hotline.[25]

---

[19] *Id.* at 23-24.
[20] *Id.*
[21] *Id.* at 20–21, 44; See Defendant's Exhibit 4: Rules and Regulations.
[22] See Defendant's Exhibit 4: Rules and Regulations.
[23] See Exhibit 1: Vesey Dep., at 55–58; Defendant's Exhibit 2: Durant Decl., at ¶ 8, Defendant's Exhibit A: Travel Guide.
[24] See Exhibit 1: Vesey Dep., at 60–62.

RESPONSE: Plaintiff was unable to report multiple types of harassment and discrimination due to a harsh work environment caused by her managers.[26]

27. Masengarb had never made a statement like that to Plaintiff before.[27]

RESPONSE: Deny, Ms. Vesey testified that Mr. Masengarb was often crass and made comments regarding Ms. Vesey's hair when it was styled in afro balls."[28]

29. Danielle Griffin, Employee Relations Representative, investigated Plaintiff's complaint. She interviewed Plaintiff one or two days after Plaintiff's initial report.[29]

RESPONSE: Plaintiff alleges that this is a disputed, material fact.  Plaintiff further states she spoke with Danielle Griffin concerning the incident with Eric Masengarb.  Plaintiff further states she has no knowledge of the context (within the fact) meant by "investigated Plaintiff's complaint" or what was actually done as part of Ms. Griffin's investigation.

34. Plaintiff claims that about a month before the "pick cotton" comment, "when [she] would wear [her] hair in two afro puffs, [Masengarb] would grab them and say, 'Oh, I like your balls." [30]

RESPONSE: Plaintiff alleges this as a material, disputed fact as it does not capture the full context of Plaintiff's experience or cited testimony concerning Mr. Masengarb on this occasion.

35. Plaintiff did not report this to anyone at Envoy during her employment.[31]

RESPONSE: Admit that Plaintiff would often not complain of every offensive incident at work due to the fact that she was uncomfortable reporting complaints to management.[32]

---

[25] See Defndant's Exhibit 7: Work Environment Policy.
[26] See Exhibit 1: Vesey Dep., at 270-272.
[27] See Exhibit 1: Vesey Dep., at 112.
[28] *Id.* at 108, 116, 126.
[29] See Exhibit 2: Griffin Dep., at 7–8, 13–16; Defendant's Exhibit 9: Griffin Notes dated 8/18/16; Exhibit 1: Vesey Dep., at 113–114.
[30] See Exhibit 1: Vesey Dep., at 115–116.
[31] *Id.* at 203-204.

36. Plaintiff does not claim that Masengarb made any other racially-motivated statements or gestures toward her.[33]

RESPONSE: Deny, Ms. Vesey testified that Mr. Masengarb would squeeze her hair and comment that he would not do so to a white co-worker.[34]

44. Plaintiff purchased a ticket to travel MLI-DFW-MIA on September 19, 2016. She volunteered to get off the flight and received a $500 travel voucher. Plaintiff was rebooked for the following day, but she canceled her reservation.[35]

RESPONSE: This is a mischaracterization of Plaintiff's testimony. Plaintiff could not find someone to cover her shift on September 20, 2016 and therefore, was unable to take her flight.[36]

51. As part of Durant's investigation, she: (a) reviewed all of Plaintiff's travel history during her employment, including her activity in Sabre and in Travel Planner; (b) pulled logs of Plaintiff's Sabre activity both in the airport and via spot.ps.aa.com; (c) interviewed Plaintiff; and (d) interviewed Watkins. [37]

RESPONSE: Plaintiff alleges that this is a disputed, material fact. Plaintiff did not speak with Ms. Durant and does not believe that her affidavit as to what she did or not do is undisputed simply because her deposition was not taken.

52. Durant made the following conclusions as a result of her investigation:

a. Plaintiff purchased the San Juan Trip using AA20.

b. Plaintiff flew standby to SJU after she missed her booked MIA-SJU flight.

---

[32] *Id.* at 111-12, 286.
[33] *Id.* at 116.
[34] *Id.*
[35] *Id.* at 148-50.
[36] *Id.* at 150.
[37] See Exhibit 2: Durant Dec., at ¶ 17.

c. She could not check in for the return flight because she missed the first leg of her trip, and passengers are not permitted to travel out of sequence.

d. Plaintiff should have called AA to have her ticket re-issued, which may have resulted in change fees, but instead called Watkins and asked him to check her in for the return flight.

e. Plaintiff purchased a flight using AA20 for travel on August 19 from MLIDFW-MCO.

f. The flight was oversold, Plaintiff volunteered to get off the flight, received a $500 voucher, and was rebooked to fly CID-DFW.

g. Plaintiff's die sine was used via spot.ps.aa.com to access her reservation in Sabre and change the rebooked ticket from CID-DFW to ORD-DFW, leading Durant to believe Plaintiff had made the change herself.

h. Plaintiff used a travel voucher to purchase Miami Trip 1.

i. Plaintiff volunteered to get off the flight due to weight restrictions, but a family of three volunteered ahead of her and Plaintiff would have been able to travel.

j. Plaintiff did not take the flight, and the MLI-DFW leg of the reservation was canceled at 2:48 p.m., five minutes before takeoff; the DFW-MIA leg was canceled a few hours later.

k. Both cancelations were done in Sabre using Plaintiff's die sine, leading Durant to believe Plaintiff had made these changes herself.

l. Plaintiff used her frequent flier miles to book Miami Trip 2.

m. The flight was weight-restricted, and Plaintiff volunteered to get off the flight, received a travel voucher for $500, was rebooked for the next day, and canceled her reservation.

n. This flight was scheduled to land at MIA at 10:26 p.m., but Plaintiff was scheduled to work at 4:00 a.m. on September 20 and she did not have a return trip booked.

o. There were no airlines with flights out of MIA that would have gotten Plaintiff back to

MLI (or to the Chicago O'Hare or Midway airports) in time for her to make it to work the

next day.

p. Durant believed Plaintiff never intended to travel on September 19.

q. On October 1, Plaintiff created a revenue reservation using her frequent flier miles account

for the Dallas Trip.

r. Plaintiff put a hold on the reservation but did not actually purchase it.

s. Less than an hour later, Plaintiff listed herself as a standby passenger for the MLI-DFW

portion of the flight.

t. Plaintiff canceled the "held" revenue reservation the next day, shortly before the MLI-

DFW flight took off.

u. The revenue reservation Plaintiff held would have required 30,000 frequent flier miles, but

Plaintiff had only a little over 6,000 miles in her account at the time.

v. By holding the reservation, Plaintiff prevented Envoy from selling a seat. [38]

RESPONSE: Plaintiff alleges that this paragraph contains both disputed material and immaterial

facts.

60. Based on the investigative findings of multiple policy violations, and the fact that Plaintiff

had an active CDD, Stevens recommended Plaintiff's termination.[39]

RESPONSE: Plaintiff alleges that this is a disputed, material fact.

61. The termination was approved by a committee that consisted of Envoy's in-house attorney,

the Vice-President of Human Resources, and the Vice-President of Finance.[40]

RESPONSE: Plaintiff alleges that this is a disputed, material fact.

---

[38] *Id.* at ¶ 19(a)-(i).
[39] See Exhibit 3: Stevens Dep., at 47–48, 55, 56–57.
[40] *Id.* at 216.

62. Stevens also recommended that Watkins receive corrective action because he checked in Plaintiff for the return flight on the San Juan Trip.[41]

RESPONSE: Plaintiff alleges that this is a disputed, material fact.

68. Plaintiff believes neither Stevens nor Durant had discriminatory or retaliatory animus toward her, testifying: "I don't believe they were the ones that were trying to retaliate against me, no."[42]

RESPONSE: Plaintiff alleges that this is a mischaracterization of Plaintiff's testimony; that this is a disputed, material fact due to the findings that Ms. White influenced Ms. Stevens and Ms. Durant's investigation.

69. While the travel investigation was ongoing, Plaintiff complained to human resources that McMurray was harassing her and stalking her by looking at her travel history.[43]

RESPONSE: Admit that Ms. Vesey made the complaint but was unaware of any investigation into her travel records at the time.

70. Griffin investigated Plaintiff's complaint regarding McMurray and interviewed Plaintiff.[44]

RESPONSE: Plaintiff alleges that this is a disputed, material fact.

71. Griffin determined that the conduct Plaintiff complained about – that McMurray looked up Plaintiff's travel reservation – would not constitute harassment or stalking under Envoy policies, even if true.[45]

RESPONSE: Plaintiff alleges that this is a disputed, material fact.

74. McMurray never made any statements to Plaintiff about not wanting to work with her.[46]

---

[41] *Id.* at 66–70.
[42] See Exhibit 1: Vesey Dep., at 196.
[43] *Id.* at 182–183; Exhibit 2: Griffin Dep., at 66-67; Defendant's Exhibit 14: Ethics-Point Complaint dated 10/4/16.
[44] See Exhibit 2: Griffin Dep., at 67, 70.
[45] *Id.* at 70–71.
[46] See Exhibit 6: Deposition of Carrie McMurray ("McMurray Dep."), at 184.

RESPONSE: This is a mischaracterization of Plaintiff's testimony. Plaintiff was informed that Ms. McMurray did not want to work with her.[47]

75. Neither McMurray nor White were involved in the decision to terminate Plaintiff's employment.[48]

RESPONSE: Deny, Ms. White was *heavily* involved in the investigation and supplied extensive information that led to the decision to terminate Ms. Vesey. Ms. White was the original provider of the travel abuse information regarding Ms. Vesey's September 19 reservations and was in constant communication with investigators of the travel abuse.[49]

### c. Disputed Immaterial Facts

13. Travel Planner is a computer system used by Envoy employees to book nonrevenue travel.[50]

RESPONSE: Plaintiff alleges this is a disputed, immaterial fact. Plaintiff further states that during Plaintiff's employment, there was a web application called "Non-Revenue Travel Planner" accessed only via Jetnet (company internal website) where employees could manage non-revenue travel reservations.

19. A CDD is the final step before termination, and it remains active for two years.[51]

RESPONSE: There is no indication of a two-year period on signed CDD.

25. Amy Leonard in human resources investigated Plaintiff's complaints, found they were unsubstantiated, but reviewed applicable policies with local management to ensure consistency.[52]

---

[47] See Exhibit 1: Vesey Dep., at 281-282
[48] See Exhibit 3: Stevens Dep., at 58; Exhibit 6: McMurray Dep., at 38–39, 59.
[49] See Exhibit 3: Stevens Dep., at 34, 35, 179-180, 183,184-186, See Exhibit 2: Griffin's Dep., at 226.
[50] See Exhibit 2: Durant Decl., at ¶ 12.
[51] See Exhibit 3: Stevens Dep., at 56– 57.
[52] See Exhibit 1: Vesey Dep., at 186.

RESPONSE: Plaintiff alleges this is a disputed, immaterial fact. Plaintiff further states that this

"fact" is a mischaracterization of Plaintiff's testimony. The cited statements were made by

Envoy counsel about what Amy Leonard did, and are not within the knowledge of Plaintiff as

to what Amy Leonard did or did not do concerning her complaints.

40. [Plaintiff] called Watkins and asked him to check her in. She did not tell him that she had not

flown the first leg of her flight.[53]

RESPONSE: Deny, as this is a mischaracterization of Plaintiff's testimony. Plaintiff states that there

was "some issue with me coming down, but I didn't believe that that should hang up my

other route, because I had called American about it."[54]

42. During that time period, Envoy offered passengers travel vouchers to volunteer to get off the

flight and re-book at a later time.[55]

RESPONSE: This is a mischaracterization of Plaintiff's testimony.

43. Plaintiff purchased a ticket to travel MLI-DFW-MIA on September 13, 2016. She

volunteered to get off the flight to receive a voucher, but another family volunteered ahead of

her. Plaintiff would have been able to take the flight, but the reservation was canceled.[56]

RESPONSE: Plaintiff purchased a ticket for the above-mentioned flights, volunteered to get off, and

*did not* receive a voucher due to the fact that a family of three volunteered ahead of her, then

subsequently having her reservation cancelled.[57] Further, Plaintiff testified to not having any

incentive to cancel her flight due to the fact that she would not receive a refund.[58] Ms. Vesey

---

[53] *Id.* at 171.
[54] *Id.*
[55] See Exhibit 5: Deposition of Ashley Emerick ("Emerick Dep."), at 74–77.
[56] See Exhibit 1: Vesey Dep., at 140–146.
[57] *Id.*
[58] *Id.* at 141.

was uncomfortable flying on September 13, 2016 due to the fact that her father had a heart

attack that morning and therefore, she was hesitant to get on the flight.[59]

45. On October 1, Plaintiff booked a reservation for a one-way ticket the following day as a

revenue passenger traveling MLI-DFW-LGA. She put the reservation on hold but did not

purchase it.[60]

RESPONSE: Deny, Ms. Vesey put the reservation on *hold* for 24 hours but was unable to purchase

the reservation for the flight due to her lack of flier miles.[61]

46. After creating the revenue reservation, Plaintiff put herself on the standby list for the MLI-

DFW leg of that same flight.[62]

RESPONSE: Plaintiff alleges that this is a disputed, immaterial fact.

48. Ashley Emerick, another station agent at MLI, filed an anonymous complaint about Plaintiff

on September 14, 2016:

> Ciara had purchased a ticket on September 10th for a flight that she already knew
> that was weight restricted because the long runway was closed in MLI for 2
> weeks. This ticket was purchased on [a] travel voucher according to PNR
> KALDFR. Ciara ended up volunteering for the flight for the $500 voucher that
> was being offered. When the flight was about to go there was enough weight
> available for her to go and she stayed behind. Ciara only brought a small purse to
> the airport and was never intending on leaving her flight. The gate agent for that
> flight…took her seat off but Ciara went into SABRE herself and cancelled out her
> first segment of the reservation so it wouldn`t show her listed as a VOL. Ciara has
> inside knowledge that the runway was going to [be] closed and that there will be
> several people getting bumped from flights in the next two weeks.[63]

RESPONSE: Deny, a complaint cannot be anonymous if the person responsible for the complaint is

known. Also, Ms. Emerick was coerced to filed a complaint against Ms. Vesey.[64]

---

[59] *Id.*
[60] *Id.* at 152–153.
[61] *Id.* at 154.
[62] *Id.* at 152–153.
[63] See Exhibit 5: Emerick Dep., at 82–84, 87; Defendant's Exhibit 12: Ethics-Point Complaint dated 9/14/16.
[64] See Exhibit 3: Stevens Dep., at 199-200

49. Human Resources Consultant Irma Stevens received the complaint to investigate [Ciara's alleged travel abuse]. She partnered with Valerie Durant, Corporate Security Investigator at AA for the investigation.[65]

RESPONSE: Plaintiff alleges that this is a disputed, immaterial fact.

50. Durant took the lead in the investigation.[66]

RESPONSE: Plaintiff alleges that this is a disputed, immaterial fact.

53. Durant concluded that Plaintiff violated Envoy's policies regarding employee travel by: (1) asking Watkins to check her in for the SJU-ORD flight that should have been a re-issued ticket; (2) changing her own revenue reservations in Sabre; and (3) holding a revenue booking for the same flight for which she listed herself as a standby passenger.[67]

RESPONSE: Plaintiff alleges that this is a disputed, immaterial fact.

56. Plaintiff did not claim that the reservation cancelations had been made by someone other than herself.[68]

RESPONSE: Plaintiff alleges that this is a disputed, immaterial fact.

57. After Durant and Stevens interviewed Plaintiff, Durant discovered another instance where Plaintiff purchased a revenue ticket for a flight for which she also listed herself as a standby passenger. Her revenue ticket was canceled as a "no-show" and Plaintiff flew standby on the flight.[69]

RESPONSE: This is an ambiguous reference with no conclusive evidence or statement as to what Durant is referring to.

---

[65] *Id.* at 11, 26-33; Exhibit 2: Durant Decl., at ¶2-4, 14-15.]
[66] See Exhibit 2: Durant Decl., at ¶ 16.
[67] See Exhibit 12: Written Statements, at ¶¶ 20-22.
[68] *Id.*
[69] See Exhibit 2: Durant Decl., at ¶ 23.

59. Stevens considered Durant to be a "subject matter expert" with respect to travel policies at Envoy and AA.[70]

RESPONSE: Plaintiff alleges that this is a disputed, immaterial fact.

63. Watkins was not on a CDD at the time.[71]

RESPONSE: Plaintiff alleges that this is a disputed, immaterial fact.

64. If Watkins had been on a CDD, Stevens would have recommended his termination, as well.[72]

RESPONSE: As this is a hypothetical, it cannot be referred to as a fact or conclusion.

67. Plaintiff does not believe Stevens or Durant were out to get her.[73]

RESPONSE: Plaintiff alleges that this is a disputed, immaterial fact.

76. One other employee at MLI was terminated for travel abuse when Plaintiff worked there: Carol Warren. She is Caucasian.[74]

RESPONSE: It is unsubstantiated as to whether Carol Warren was terminated for travel abuse, or the same/similar travel abuse that Ciara was terminated for.

### d. Undisputed Immaterial Facts

3. As an Envoy employee, Plaintiff enjoyed certain travel benefits, such as the ability to fly standby ("non-revenue") for any Envoy or AA flight that had available seats.[75]

RESPONSE: Undisputed, immaterial fact.

11. Employees can access the Sabre system outside of work though spot.ps.aa.com.[76]

RESPONSE: Undisputed, immaterial fact.

---

[70] See Exhibit 3: Stevens Dep., at 242–243.
[71] Id. at 70.
[72] Id. at 72.
[73] See Exhibit 1: Vesey Dep., at 173.
[74] See Exhibit 4: White Dep., at 54–55; Exhibit 1: Vesey Dep., at 210–211.
[75] See Exhibit 2: Durant Dec., at ¶ 6.
[76] See Exhibit 1: Vesey Dep., at 247; Exhibit 2: Durant Decl., at ¶ 10.

12. When an employee uses Sabre in the airport, he or she will be automatically logged out if there is no    activity after a certain period of time.[77]

RESPONSE: Undisputed, immaterial fact.

16. On November 17, 2014, Plaintiff received a Career Decision Day ("CDD") Advisory after driving the jet bridge into an aircraft. [78]

RESPONSE: Undisputed, immaterial fact.

17. Plaintiff understood this was a serious accident.[79]

RESPONSE: Undisputed, immaterial fact.

18. Following that accident, Plaintiff signed a Letter of Commitment, agreeing to comply with all company rules and regulations going forward.[80]

RESPONSE: Undisputed, immaterial fact.

24. In February and March 2016, Plaintiff complained to human resources about favoritism and bias in the workplace.[81]

RESPONSE: Undisputed, immaterial fact.

30. Griffin is African-American.[82]

RESPONSE: Undisputed, immaterial fact.

31. Griffin also interviewed Masengarb, Watkins, and Stinocher as part of her investigation.[83]

RESPONSE: Undisputed, immaterial fact.

32. Griffin determined that Plaintiff's complaint was substantiated and Masengarb's comments violated Envoy policies. She recommended termination of Masengarb.[84]

---

[77] *Id.* at 247; Defendant's Exhibit 2: Durant Decl., at ¶ 11.
[78] See Exhibit 1: Vesey Dep., at 35–37; Defendant's Exhibit 5: Career Decision Day Advisory ("CDD") dated 11/21/14.
[79] See Exhibit 1: Vesey Dep., at 39.
[80] *Id.* at 40.
[81] See Dkt. Entry # 1: Complaint, ¶ 8; Exhibit 1: Vesey Dep., at 71– 72.
[82] See Exhibit 2, Griffin Dep., at 109.
[83] *Id.* at 20–21, 24–25, 27.

RESPONSE: Undisputed, immaterial fact.

37. In January 2016, Plaintiff took a trip to San Juan, Puerto Rico, traveling MIA-SJU, returning

SJU-ORD.[85]

RESPONSE: Undisputed, immaterial fact.

38. Plaintiff did not make the MIA-SJU flight, but found a different way to get to SJU.[86]

RESPONSE: Admit that Ms. Vesey missed her connecting flight and had to find a different way to

get to SJU.[87] Ms. Vesey called American Airlines regarding this missed connection flight.[88]

Undisputed, immaterial fact.

39. Plaintiff was unable to check in for her return flight.[89]

RESPONSE: Undisputed, immaterial fact.

41. In September 2016, the long runway at MLI was closed for construction. Envoy could only

use the shorter runway for its flights and as a result, its flights were weight-restricted,

meaning fewer passengers could be on board.[90]

RESPONSE: Undisputed, immaterial fact.

47. Plaintiff was trying to get back to Dallas for training and never intended to fly the DFW-

LGA leg of the flight.[91]

RESPONSE: Admit that Ms. Vesey only intended on traveling to Dallas for the purpose of training

and did not intend to fly to LGA because she received a better price for the flight to Dallas if

she reserved the flight to LGA contemporaneously. Undisputed, immaterial fact.

66. Stevens and Durant are both African-American woman. [92]

---

[84] *Id.* at 39, 40–41.
[85] See Exhibit 1: Vesey Dep., at 170.
[86] *Id.* at 170-171
[87] *Id.* at 171-173
[88] *Id.* at 171.
[89] *Id.* at 171.
[90] See Exhibit 4: Deposition of Teresa White ("White Dep."), at 174–175.
[91] See Exhibit 1: Vesey Dep., at 154, 155.

RESPONSE: Undisputed, immaterial fact.

73. McMurray did not make any racially motivated remarks to Plaintiff.[93]

RESPONSE: Undisputed, immaterial fact.

### e. Additional Material Facts

1. A Ground Security Coordinator ("GSC") is required to be available during all departures to resolve any security issues.[94]

2. Due to this requirement, many staff personal at Envoy required GSC training.[95]

3. Upon information and belief, Envoy regularly has its full-time employees go through GSC training, however, some part-time employees were also allowed to take part in such training.[96]

4. Upon information and belief, Teresa White would ask part-time Caucasian employees to undergo GSC training.[97]

5. Ciara Vesey, a part-time employee, and two other African American colleagues that were full-time and part-time, were not selected by Ms. White to take part in GSC training prior to making any complaints to HR regarding such treatment.[98]

6. Upon information and belief, Ciara and her African American co-workers were not asked to do GSC training due to their race and Teresa White's uncomfortable demeanor toward African Americans.[99]

7. Due to this, on March 22, 2016, Ciara emailed Amy Leonard complaining about Ms. White's unfair treatment towards Ms. Vesey and other African American co-workers.[100]

---

[92] *Id.* at 159.
[93] *Id.* at 191–192.
[94] *Id.* at 83.
[95] *Id.*
[96] *Id.* at 87.
[97] *Id.*
[98] *Id.* at 86.
[99] *Id.* at 88.

8.  Upon information and belief, Ms. White retaliated against Ciara when she was looking into Ciara's travel history regularly after her complaints were filed against her, Ms. McMurray and Mr. Masengarb.[101]

9.  It is not standard protocol and is improper for one employee of Envoy to look into another employee's travel history and records.[102]

10. Upon information and belief, it is uncommon for a GM to look into an employee's travel history.[103]

11. Furthermore, Ms. White has shown animus towards Ms. White by stating to coworkers that Ms. Vesey reported her for prejudice and suggesting that Ms. Vesey should be terminated and that Mr. Masengarb should be rehired even though he made racist remarks towards Ms. Vesey.[104]

12. Ms. White further discriminated against Ms. Vesey when she refused to allow her to take a leave from work due to a family members health complication, stating that Ciara needed to take FMLA leave in order to take time off.[105]

13. Shortly after Ms. White denied Ms. Vesey's requested to take personal leave, she allowed a Caucasian co-worker by the name of Dawn to take personal time off.[106]

14. On September 22, 2016, after looking into Ms. Vesey's travel history, Ms. White contacted Irma Stevens via email to indicate that Ms. Vesey had committed travel abuse.[107]

15. This email was very similar to an anonymous complaint that was filed a few days prior to Ms. White's email.[108]

---

[100] *Id.* at 70-72.
[101] *Id.* at 180-181.
[102] See Exhibit 2: Griffin Dep., at 213.
[103] See Exhibit 1: Vesey Dep., at 269.
[104] *Id.* at 202, 272.
[105] *Id.* at 199-200.
[106] *Id.* at 201.
[107] See Exhibit 2: Griffin's Dep., at 226, See Exhibit 3: Stevens Dep., at 35, 179-180.

16. Furthermore, the travel abuse issues regarding Ms. Vesey's travels on September 19, were originally brought Ms. Steven's attention not through a complaint, but rather through Ms. White's emails to Ms. Stevens.[109]

17. Throughout the investigation, Ms. White consistently supplied information to Ms. Steven's and Ms. Durant regarding Ms. Vesey's travel abuse.[110]

18. Plaintiff also submits the attached affidavit in support of her response.[111]

## III.   ARGUMENT

### A.   <u>**Plaintiff has Presented a Viable Case Under Title VII and IHRA**</u>

Defendant does not dispute that there was a protected act, nor that there was a materially adverse employment action taken against Vesey, it merely disputes the causal connection.

#### 1.   *Plaintiff has presented sufficient direct and indirect evidence*

Under the "direct" method of proof, Plaintiff must offer evidence of three elements: (1) they engaged in protected activity; (2) they suffered adverse employment actions; and (3) there was a causal connection between the protected activity and the adverse employment actions.  *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (2015). Under the indirect or circumstantial proof method, the first two factors are the same and the third factor is "evidence that the employer's proffered reason for the adverse employment action was pretextual." *Id.* at 565.

If Plaintiff's proofs are treated as the truth, which it must in a motion for summary judgment, she engaged in protected activity. Defendant admits that she suffered a materially adverse employment action in that she was fired.

---

[108] See Exhibit 3: Stevens Dep., at 34, 183.
[109] *Id.* at 184-186.
[110] *Id.* at 234-235.
[111] See Exhibit 12 – Plaintiff's Affidavit.

Under the third prong, Plaintiff has presented evidence that the timing of her firing was suspicious and that the timing of the adverse actions was pretextual.  While Defendant claims otherwise, there is a casual connection between Plaintiff's complaints and her termination. Defendant would have the Court believe that the standard with respect to timing is two or three days, pursuant to the *Kidwell v. Eisenhauer*, 679 71D 937, 966 (7th Cir. 2012).  In *Castro*, citing *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012), the 7th Circuit explicitly stated that "[w]e have rejected any bright-line rule about how close the events must be to establish causation, but in cases where there is 'corroborating evidence of retaliatory motive,' an 'interval of a few weeks or even months may provide probative evidence of the required causal nexus.' Therefore, the fact of the timing alone – whether it be close in time or far apart – is not a basis for summary judgment.

Here, Plaintiff has presented evidence that her managers wanted her fired, that (1) Teresa White communicated constantly with human resources regarding Plaintiff immediately after the incident happened with Mr. Masengarb; (2) there was no actual policy that covered the violations that Plaintiff allegedly violated; and (3) White encouraged Ashley Emerick to report Plaintiff for travel abuse on a day when Emerick was not even working – among a variety of other evidence. The simple presentation of these three pieces of evidence is sufficient for Plaintiff to present a prima facie case of retaliation under Title VII under both the direct and indirect method.

**B.** **Defendant is Liable Under the "Cat's Paw" Theory of Liability for the Actions of McMurray and White**

Per the testimony given by Stevens at pages 199-200, White provided all of the information to Defendant upon which it formed its opinion as to Plaintiff's intentions regarding the alleged travel abuse, which it was revealed through the deposition of Emerick was coerced.  Plaintiff has

not stated a belief that Durant or Stevens were retaliating against her, but rather that White and

McMurray were.

Explaining the cat's paw theory of liability in *Miller v. Polaris Laboratories, LLC*, 797 F.3d

486 (7th Cir. 2015):

> Liability for discriminatory action under this theory is premised on the ability of
> the culpable actor to use an innocent decisionmaker as an 'unknowing tool' of the
> former's animus. *Hutchens v. Chicago Bd. of Educ.*, 781 F.3d 366, 373 (7th
> Cir.2015); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 422, 131 S.Ct. 1186,
> 179 L.Ed.2d 144 (2011) ('[I]f a supervisor performs an act motivated by
> [discriminatory] animus that is intended by the supervisor to cause an adverse
> employment action, and if that act is a proximate cause of the ultimate
> employment action, then the employer is liable.' (citation and footnote omitted)).
> An employer is liable under Title VII or Section 1981 when 'a non-decision-
> making employee with discriminatory animus provided factual information or
> input that may have affected the adverse employment action.' *Matthews v.
> Waukesha Cty.*, 759 F.3d 821, 829 (7th Cir.2014). **In cat's paw cases, we regard
> the biased subordinant's actions as direct evidence of discrimination**. *Nichols
> v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014).

(emphasis added).  It is quite clear that White had discriminatory animus based upon the fact that

she did not want to see Mr. Masengarb fired following Plaintiff's complaint, and that she

encouraged Ashley Emerick to report Plaintiff for travel abuse that the latter did not even

witness.  White and McMurray continued to report Plaintiff for alleged violations of company

policy – not all of which were substantiated – with the clear intention that it would result in her

termination, which it did.

Although Defendant claims that Plaintiff did not meet Defendant's legitimate

expectations, McMurray stated in her deposition at page 62 that Plaintiff was a good worker and

it that it hurt the team at Moline to lose her.  Plaintiff was never written up for any conduct

related issues until after she complained of racial discrimination which caused Masengarb to be

fired.  Further, according to McMurray's own deposition at pages 41-43, McMurray – who is

clearly outside of Plaintiff's protected class – violated the same travel policies. Moreover, although Defendant tried to point to Michael Watkins as evidence that someone else was disciplined for violating travel policies, he was also not fired for the same.

Furthermore, Plaintiff set forth in both of her equal employment opportunity commission ("EEOC") complaints how she was treated less favorably than similarly situated employees by White. Exhibit 11 – Excerpt from Plaintiff's EEOC Complaint. Based upon the facts set forth herein, Plaintiff has stated a claim under the cat's paw theory of liability as to Defendant's responsibility for the actions of Plaintiff's superiors.

### C. Plaintiff Has Stated A Claim For A Hostile Work Environment

In accordance with *Rodgers v. Western-Southern Life Ins. Co*., 12 F. 3d 668 (7th Cir. 1993), hostile work environment claims are analyzed under a two-step analysis:

> The existence of racial harassment in a hostile work environment involves an application of facts (the specific discriminatory conditions alleged by the plaintiff) to law (the standards governing the existence of racial harassment and hostile work environment discrimination) (*Daniels v. Essex Group, Inc*., 937 F.2d 1264, 1269 (7th Cir.1991)). In *Daniels,* this court declined to adopt a multi-factor test for Title VII harassment claims because such a test "has the potential for a mechanical application that overlooks or underemphasizes the most important features of the harassment inquiry." *Id*. at 1271. Instead, we have evaluated Title VII harassment claims against both an objective and subjective standard. Id. (racial harassment claim); *Brooms v. Regal Tube Co.,* 881 F.2d 412 (7th Cir.1989) (sexual harassment claim). As we explained in Brooms, this conjunctive approach allows us to consider "the likely effect of a defendant's conduct upon a reasonable person's ability to perform his or her work and upon his or her well-being as well as the actual effect upon the particular plaintiff bringing the claim." 881 F.2d at 419 (emphasis added).

As stated above, Plaintiff's work environment consisted of the following during just one year in 2016, which ramped up after Plaintiff reported Masengarb for his discrimination which resulted in his termination: 1) White talked about getting Plaintiff fired; (2) White looked into Plaintiff's travel records and had others do the same; (3) Plaintiff complained about poor treatment by

White to Defendant, about which nothing was done; (4) Plaintiff complained about White's poor treatment toward African Americans and the lack of giving GSC training to African-American employees; (5) Plaintiff endured racist comments and conduct from Masengarb regarding "picking cotton" and touching her "afro puffs"; (6) Plaintiff was uncomfortable speaking to management about any issues she was experiencing; and (7) McMurray refused to work with Plaintiff, which caused her to hurt herself from trying to do the work of two people.  Under the totality of the circumstances presented herein, Plaintiff has presented at least a question of fact of as to whether Plaintiff's work environment was hostile.

**D.  There Is A Legitimate Question of Fact Regarding the Travel Abuse**

Defendant has gone out of its way to try to legitimize the fact that it claims it fired Plaintiff for abusing travel privileges.  However, Plaintiff disputes all of the alleged instances and was not told about any of these issues when she was fired.  Not one person who testified under oath understood the alleged travel policies that Plaintiff abused, nor could Defendant explain how Plaintiff paying for her ticket was a violation of policies related to non-revenue passengers, which is the only policy Defendant has cited. . Instead, Defendant relies on the unsubstantiated affidavit of Valerie Durant, whom Defendant chose not to depose, to suddenly present evidence to support its alleged theory.  Further, Plaintiff disputes that anything that Defendant claims was a "serious" violation was in fact serious enough to result in her termination.  This is an obvious question of fact that should be determined by a jury.

Plaintiff must point out that Defendant states several times that Plaintiff did not present evidence to show how Defendant treated her versus others – which is suddenly relevant – which flies in the face of Defendant's position throughout this litigation that none of this information regarding how Plaintiff was treated was relevant at all.  Plaintiff should have been provided this

information when specifically requested.  It cannot now refuse to provide the information –

which it concedes is relevant – and which it has a continuing obligation under Fed. R. Civ. P. 26

to provide the same. Under these circumstances, summary judgment is not appropriate.

## IV.  <u>CONCLUSION</u>

WHEREFORE Plaintiff prays that this Honorable Court conducts a hearing regarding Plaintiff's discovery dispute.


Dated:  July 29, 2019                    Respectfully Submitted,

                                         /s/ Carla D. Aikens_____
                                         Carla D Aikens (P69530)
                                         Carla D. Aikens, P.C.
                                         Attorneys for Plaintiff
                                         615 Griswold Ste. 709
                                         Detroit, MI 48226
                                         carla@aikenslawfirm.com


## <u>CERTIFICATE  OF  SERVICE</u>

The  undersigned  certifies  that  a  copy  of  the  foregoing  instrument  was  served  upon all  parties  to  the  above  cause  to  each  of  the  attorneys  of  record  herein  through  the electronic  filing  system  on  July 29, 2019 by:

*/s/ Carla D. Aikens*